## OUTBOUND MARITIME CORPORATION

v.

## P.T. INDONESIAN CONSORTIUM OF CONSTRUCTION INDUSTRIES and ICCI/AME Joint Venture.

### Civ. No. HM83–3970.

United States District Court, D. Maryland.

March 13, 1984.

See  also, D.C., 575 F.Supp. 1222.

James W. Bartlett, III, J. Marks Moore, III, Semmes, Bowen & Semmes, Baltimore, Md., for plaintiff.

Manfred W. Leckszas, Donald C. Greenman, John H. West, III, Ober, Kaler, Grimes & Shriver, Baltimore, Md., Edna R. Sussman, White & Case, New York City, for defendants.

## MEMORANDUM

HERBERT F. MURRAY, District Judge.

Plaintiff Outbound Maritime Corporation ("Outbound") instituted this breach of contract action on November 18, 1983, invoking the admiralty and maritime jurisdiction of this court. On that same date, the court, at plaintiff's request, ordered the maritime attachment and garnishment of certain cargos owned by defendants and located within the district of Maryland.

On December 10, 1983, defendants P.T. Indonesian Consortium of Construction Industries ("ICCI") and ICCI/AME Joint Venture ("JV") filed a motion pursuant to Local Rule 48 for an order requiring plaintiff to show cause why the attachment of defendants' property should not be vacated. Local Rule 48 provides that a party whose property is attached is entitled to a show cause hearing "upon a showing of any improper practice or a manifest want of equity on the part of plaintiff." Defendants contended (1) that the contract at issue is not maritime in nature and consequently could not properly be asserted as the basis for this court's admiralty jurisdiction or for the attachment under Rule B, Supplemental Rules for Certain Admiralty and Maritime Claims; and (2) that the defendants' property is immune from prejudgment attachment under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611, since the defendants are corporations wholly owned by the Republic of Indonesia, a foreign sovereign. The court issued the show cause order and scheduled a hearing to determine the merits of the matter.

Having considered the evidence presented at the hearing and the briefs submitted by the parties, the court finds, for the reasons stated herein, that there is no proper basis for asserting this court's admiralty jurisdiction. In addition, under the FSIA, defendants' property may not be attached prior to judgment.

*The Contract*

At issue in this case is an oral contract allegedly entered into around June 2, 1983 by Outbound and ICCI, as agents for JV, to ship various cargos from the United States to Saudi Arabia. Complaint at ¶ 7. The contract was negotiated and consummated in New York City. *Id.* at ¶ 8. In connection with the contract, defendants apparently procured a letter of credit from Midland Bank in the amount of $1,500,-000.00, naming Outbound as the beneficiary. *Id.* at ¶ 9. After several shipments had been made and paid for under the letter of credit, defendants allegedly wrongfully terminated the contract. As liquidated damages, Outbound claims the balance of the funds available under the letter of credit, approximately $1,455,-000.00.

Plaintiff asserts that the contract was clearly maritime in nature since it was for the ocean carriage of cargo from New York to Saudi Arabia. Plaintiff argues that other services procured for the defendants, such as air and inland transportation, were incidental to the maritime contract. Defendants assert that the contract at issue was a contract preliminary to a contract for the shipment of goods by sea. Such a contract, defendants argue, is precisely the kind of contract which courts have historically declined to recognize as maritime in nature.

At the hearing held in this matter, J. Kenneth Shayne, President of Outbound, testified that Outbound is a non-vessel owner common carrier (NVOCC). NVOCC's are regulated by the Federal Maritime Commission ("FMC") and must keep a freight tariff on file with the FMC.

Title 46 of the Code of Federal Regulations, § 510.2(1) defines an NVOCC as a

> common carrier by water ... which does not operate the vessels by which its ocean transportation is provided but which holds itself out, by the establishment and maintenance of tariffs, by advertisement, solicitations, or otherwise, to provide transportation of property for hire by water in commerce from the United States; which assumes responsibility or has liability imposed by law for the safe transportation of such property; and which arranges in its own name for the performance of such transportation by underlying water carriers.

He also testified that to operate as an NVOCC, a carrier is required to have a tariff on file with the FMC. Outbound's tariff was not filed with the FMC and did not become effective until July 8, 1983, more than one month after the contract at issue here was negotiated and entered into by the parties.

Shayne further testified that on May 31, 1983 he met with Tjuk Sudarsono, the general manager of ICCI, to discuss the carriage of defendants' cargos to Saudi Arabia. Shayne testified that at that meeting, Outbound and ICCI agreed upon the ocean freight rates to be charged by Outbound for the shipment of break bulk and containerized cargo. Those rates, Shayne stated, were identical to the rates listed in the tariff later filed by Outbound with the FMC. Outbound requested an irrevocable letter of credit in the amount of $1,500,-000.00 to cover the cost of ocean carriage; the parties also discussed and agreed to a penalty arrangement in the event of cancellation. A letter dated May 31, 1983 set out Outbound's proposed ocean freight charges between "East & Gulf Coast Ports and Dammam". Plaintiff's Hearing Exhibit 2. The letter also states that unloading charges were to be set according to the schedule of various ports and that a proposal for local transportation and clearance

in Saudi Arabia would be submitted in a separate letter. *Id.*

As apparently agreed to, a letter of credit was procured by the defendants on June 2, 1983. Defendants' Hearing Exhibit 11. By its terms, the letter of credit covers:

> 1) Inland freight, air and ocean freight, forwarder's fee and related charges for shipment emanating from U.S.A., Europe and Asia to Saudi Arabia port and or airport. 2) Port clearance, charges, custom import duty, handling and inland transportation charges in Kingdom of Saudi Arabia.

*Id.* Shayne testified that the provisions in the letter of credit for customs duties, inspection and port clearance charges never became applicable because a contract for those items was never made.

Neither the exact number of containers nor the specific quantity of cargo to be shipped was indicated at the meeting. Instead, it was estimated that defendants would require Outbound to handle the shipment of approximately three hundred forty-foot containers. According to Shayne, the $1.5 million amount for which the letter of credit was obtained was based on the anticipated ocean freight costs for that estimated number of forty-foot containers.[1] As a result of their discussions, Shayne also anticipated that as soon as additional funds became available to defendants and the $1.5 million letter of credit was exhausted, defendants would procure a new letter of credit for $3 million to provide a continuous flow of money to cover ocean freight charges and "accommodation" advances.

Although the letter of credit had an expiration date of September 30, 1983, which was later extended to December 31, 1983, the date on which shipments were to be made was also not specified. In addition, no particular cargo was assigned by defendants to Outbound. As defendants placed purchase orders with their vendors,

---

1. Shayne testified that Outbound's tariff for that type of container is $6,100.00 per container. Shipment of three hundred such containers would therefore cost approximately $1.8 million. In fact, the May 31 letter lists the rate for that type of container as $6,200.00 per; the anticipated freight costs using this higher rate would not be significantly higher.

they gave Outbound a copy of the purchase orders so Outbound could determine what cargo would become available for shipment to the defendants. It was contemplated that the services referred to by Shayne as "accommodation services" would be determined at time of shipment. Thus, the type of inland freight to be utilized to get the cargo from the vendor to a port of departure in the United States was to be determined at time of shipment. So also, a determination of whether air freight would be required because of time constraints was to be made at time of shipment.

From July to September 1983, various shipments to defendants in Saudi Arabia were handled by Outbound. Thirteen separate invoices corresponding to those shipments were introduced in evidence. Defendants' Hearing Exhibit Nos. 1–10, 13, 14. Outbound received payment for all the charges listed on those invoices by drawing down on the letter of credit. A summary of those invoices indicates the following charges:

| ocean freight | ----- | $ 20,474.62 |
| air freight | ----- | 14,198.03 |
| inland freight | ----- | 2,270.14 |
| other | ----- | 7,294.82 |

(including document preparation, communication, forwarding and postage costs)

Defendants' Hearing Exhibit 15. The total amount drawn on the letter of credit was approximately $44,000.00. Shayne further testified that the non-ocean carriage services charged in the invoices were provided by Outbound as an accommodation to defendants; similarly, as an accommodation, Outbound subcontracted for the air carriage of four of the shipments because there were urgent transit considerations with respect to that cargo. Shayne also stated that a freight forwarder cannot issue bills of lading and therefore the bills of lading issued with respect to the shipments made to defendants were issued by Outbound acting as an NVOCC.

Finally, Shayne stated that prior to the effective date of the tariff, Outbound was not an active entity. It had not conducted any business until the contract at issue here was made. It was a one-account oper-ation; apparently, it only provided services for these defendants. Its certificate of incorporation was apparently filed with the State of New York in May 1981. Defendants' Reply Memorandum, Exhibit A. Its corporate charter empowers Outbound to act as, among other things, a carrier, a freight forwarder, a customs broker and agent, and an intermediary between carriers and exporters and importers. In relevant part, Outbound's corporate charter states that it was formed:

a) To act as a carrier of goods by land, sea and air; to render general services in connection with the receiving, handling, storing and transportation of goods in intrastate, interstate and international commerce; to act as a land, sea and air forwarder, customs broker and agent, and intermediary between carriers and exporters and importers.

b) To act as duly authorized representative or agent of and for any corporation, foreign or domestic, which may be authorized to do business in this State or any other state or foreign country ...

*Id.*

### Maritime Jurisdiction

To meet its burden of showing cause why the garnishment of defendants' property should not be vacated, Outbound is required to show that it has a maritime cause of action. The second requirement for a maritime attachment, that defendants could not be found within this District, is not disputed in this case.

■ "The boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961). When based upon a contract, maritime jurisdiction "depends upon the nature and subject matter of the contract." *Sanderlin v. Old Dominion Stevedoring Corp.*, 385 F.2d 79, 81 (4th Cir.1967), *citing North Pacific SS v. Hall Bros. Co.*, 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510 (1919). A contract is maritime if it relates to a ship

in its use in commerce or upon navigable waters. *New Jersey Steam Navigation Co. v. Merchants' Bank*, 47 U.S. 344, 378, 392, 6 Howard 344, 378, 392, 12 L.Ed. 465 (1848); 1 *Benedict on Admiralty* § 183 at 11–6 (7th Ed.1981). Thus, a contract for the carriage of goods by sea is clearly maritime in nature. *Swift & Co. Packers v. Compania Colombiana del Caribe*, 339 U.S. 684, 691, 70 S.Ct. 861, 866, 94 L.Ed. 1206 (1949).

■ Courts, on the other hand, have uniformly held that contracts "preliminary to", rather than involving the maritime activity itself, are not within maritime jurisdiction. *Gilmore & Black, The Law of Admiralty* at 26–27 n. 91 (2d Ed.1975); 1 *Benedict on Admiralty* § 184. The rationale for this distinction is that although these preliminary services relate to the business of the ship, they are essentially no different from services ordinarily performed by other shoreside persons who are not involved in the operation or navigation of the ship. *P.D. Marchessini & Co. v. Pacific Marine Co.*, 227 F.Supp. 17, 18 (S.D.N.Y.1964).

■ The contract at issue here clearly involved an agreement for the carriage of goods by sea. Proof of this is evident from the undisputed testimony of Kenneth Shayne, and is supported by the May 31, 1983 letter, by the letter of credit and by the shipments actually handled by Outbound under the contract. Moreover, the agreement encompassed the performance of services that went beyond those of a nature ordinarily considered preliminary to a maritime contract. While Outbound was to perform duties similar to those of a cargo broker, which are of a preliminary nature and end when the cargo is delivered to the pier, the agreement here also encompassed the actual shipment of the cargo by Outbound acting as an NVOCC. The fact that Outbound was not an NVOCC at the time that it entered into the contract is not significant. The evidence of record before the court indicates that at all times pertinent to the formation of the contract, Outbound intended to handle the ocean ship-ments as an NVOCC; the ocean freight rates agreed upon were identical to the tariff subsequently filed by Outbound with the FMC; and the actual shipments were handled by Outbound as an NVOCC. The fact that various terms, such as the date of shipment and the designation of the cargo to be shipped, were to be determined at a later time is also not significant. None of the cases cited by defendants stand for the proposition that a contract for the shipment of unspecified cargo at an unspecified but circumscribed time in the future cannot be deemed to be of a maritime nature.

■ The significant factor in determining whether a contract is non-maritime because it is preliminary to a maritime contract is whether the functions to be performed under the contract are "of a preliminary nature and end when the freight is placed at the pier ..." *Seawind Compania, S.A. v. Crescent Line*, 211 F.Supp. 157, 159 (S.D.N.Y.1962). The seminal and often-quoted passage on this issue is found in *The Thames*

> The distinction between preliminary services leading to a maritime contract and such contracts themselves have been affirmed in this country from the first, and not yet departed from. It furnishes a distinction capable of somewhat easy application. If it be broken down, I do not perceive any other dividing line for excluding from the admiralty many other sorts of claims which have a reference, more or less near or remote, to navigation and commerce. If the broker of a charter-party be admitted, the insurance broker must follow,—the drayman, the expressman, and all others who perform services having reference to a voyage either in contemplation or executed.

10 F. 848 (S.D.N.Y.1881) (Brown, J.). Based on the evidence before the court, it is clear that the agreement here was not limited to preliminary off-shore duties but contemplated the ocean carriage by Outbound acting as an NVOCC, of at least some of the cargo. Thus, the contract was not merely preliminary to a maritime contract; at least in some respects, it was

maritime in nature involving a ship in its use in commerce on navigable waters.

Defendants are correct, however, in asserting that the contract is not wholly maritime. To serve as the basis of maritime jurisdiction a contract must be "purely" maritime. *The Eclipse*, 135 U.S. 599, 10 S.Ct. 873, 34 L.Ed. 269 (1890). In mixed contracts, maritime jurisdiction may nonetheless attach if the non-maritime elements of the contract are not substantial or if they are separable from the maritime elements. *Flota Maritima Browning de Cuba v. Snobl*, 363 F.2d 733, 735 (4th Cir.) *cert. denied*, 385 U.S. 837, 87 S.Ct. 82, 17 L.Ed.2d 71 (1966). The non-maritime elements of the instant contract are substantial and not merely incidental to the maritime elements; furthermore, the maritime elements are not susceptible of a separate adjudication. Consequently, maritime jurisdiction may not be exercised in this case.

The contract at issue here involved an agreement to undertake substantial non-maritime services. As alleged in the complaint, the contract was made "on or about June 2, 1983", the date the letter of credit was issued. The letter of credit clearly evidenced an agreement to ship by land, air or sea, to forward freight within the United States, to handle customs and other documentation and to perform other general services usually handled by freight forwarders. The evidence does not indicate that the parties intended that sea shipments be the sole, or even the primary element of the contract. Shayne's testimony shows that the parties discussed and contemplated that Outbound would perform the non-maritime services listed in the letter of credit. Shayne's contention that these other services were provided only as an accommodation to the defendants is inconsistent with the rest of the evidence. More than half of the charges involved in the transactions actually handled by Outbound were for services other than the carriage of goods by sea. Indeed, four of those thirteen transactions involved solely non-maritime activities as the cargo was shipped by air. This was not simply a contract for the shipment of goods by sea

with some incidental non-maritime duties. Outbound undertook to perform those functions necessary to prepare, store and move the then unspecified cargo from defendants' vendors in the United States, Europe and Asia to Saudi Arabia. Clearly, this was an agreement which contemplated not merely incidental, but substantial non-maritime services.

Moreover, a separate adjudication of the non-maritime elements is not possible. Outbound claims the balance of the letter of credit as liquidated damages. Yet, the letter of credit covers maritime and non-maritime services alike. It does not segregate the amounts available for any of the listed services or differentiate the covered services in any other manner. Although Shayne testified that the defendants contemplated shipping approximately three hundred forty-foot containers, he also testified that the manner of shipment of the unspecified cargo could not be determined until the actual time of shipment. Because both the designation of the cargo and the manner of shipment were left to be later determined, there is no measure by which the court would be able to separate out and assess the damages flowing from the alleged breach of the maritime elements of the contract. Any possible formulation would be too speculative. Both the maritime and non-maritime elements, which were integrally bound together, were to be paid from the same letter of credit. Under similar circumstances, the court in *Alaska Barge and Transport, Inc. v. United States*, 373 F.2d 967, 179 Ct.Cl. 216 (1967), found that the maritime and non-maritime elements of the contract were not separable because all payments had been made pursuant to bills of lading which did not itemize the services as maritime or otherwise. The fact that the invoices for the shipments actually handled by Outbound itemize the maritime and non-maritime services separately, or that the instant bills of lading cover just the ocean carriage costs does not distinguish the holding in *Alaska Barge* for purposes of this case as suggested by Outbound. Outbound is not here

suing on the itemized bills of lading and invoices since it received full payment for those items by drawing on the letter of credit. As in *Alaska Barge,* the significant document here, the letter of credit, does not permit a separate adjudication of the maritime and non-maritime elements of the contract. Nor did Shayne's testimony indicate that anything considered by the parties during the negotiations for the oral contract may serve as the basis for a separate adjudication. The instant contract, involving both maritime and non-maritime elements, is indivisible. Accordingly, the instant contract not being wholly maritime in nature and the non-maritime elements being both substantial and inseparable from the maritime elements, maritime jurisdiction may not attach.

*Foreign Sovereign Immunity Act (FSIA)*

In the alternative, assuming for purposes of considering the issue raised under the FSIA that the court erred in its finding of lack of maritime jurisdiction, the prejudgment attachment must nonetheless be vacated because defendants are immune from such attachment under the FSIA. Defendants contend that they are agencies or instrumentalities of the Republic of Indonesia as defined in 28 U.S.C. § 1603(b) of the FSIA, and are therefore immune from prejudgment attachment under the provisions of § 1609 and § 1610(d) of the FSIA. Outbound replies that defendants have failed to present sufficient proof that they are owned by the Republic of Indonesia and are therefore not entitled to the protections of the Act. The court concludes that defendants produced sufficient evidence of their status as a foreign sovereign.

■ The burden of producing evidence in support of their claim of immunity from prejudgment attachment rests with the defendants. *Jet Line Services, Inc. v. M/V MARSA EL HARIGA,* 462 F.Supp. 1165, 1171 (D.Md.1978). There is no dispute that

if defendants are an "agency or instrumentality of a foreign state" as defined in § 1603(b), their property may not be attached prior to the entry of judgment. Section 1603(b) provides:

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

The sole contested issue involves the application of part (2) of § 1603(b).

■ As proof of state ownership, defendants introduced an affidavit of Havid Abdulgani, Consul of the Consulate General of the Republic of Indonesia in New York, dated December 9, 1983.[2] In pertinent part that affidavit states:

2. ... By virtue of Presidential Regulation No. 19 dated May 5, 1983, ICCI became a corporation wholly-owned by the Government of the Republic of Indonesia. The transfer of shares directed in that regulation was effected on June 11, 1983, by payment to the private shareholders of the amounts each had paid in to ICCI. The shares held by the government-owned corporations were transferred to the Government of the Republic of Indonesia.

. . . . .

4. JV is a joint venture entered into by ICCI with the Al Miraibid Establishment ("AME"), a Saudi Arabian Entity, in order to perform on certain construction projects in Saudi Arabia. ICCI owns

---

**2.** Although a copy, rather than the original, of this affidavit, was introduced in evidence, Outbound has not challenged the authenticity of the document nor in any other manner objected to its form. A copy of the Presidential Regulation, translated into English, was submitted by Outbound as an attachment to its memorandum. A copy of the original untranslated version was also attached.

a majority of the ownership interest in JV.

Presidential Regulation No. 19, referred to in the affidavit, states in pertinent part:

> Considering: a. that, pursuant to the policy of the Government of the Republic of Indonesia to increase non-oil export and to create new employment in the construction industry, both domestically as well as overseas, and to upgrade the capability and international experience of Indonesian technicians in the construction industry, the Republic of Indonesia considers it necessary to invest in the stock capital of ICCI LTD through the purchase of all stocks of said company from its shareholders;
>
> .   .   .   .   .
>
> #### Article 2
>
> 1. Investment by the Government as defined in Article 1 shall be implemented as follows:
>    a. By the purchase of all shares of ICCI LTD owned by private companies as indicated in Exhibit I, at nominal prices (at par);
>    b. By assigning to the Government of the Republic of Indonesia all shares of ICCI LTD owned by state-owned corporations (PERSERO) in the construction industry, as indicated in Exhibit II, henceforth converting them into an investment by the Government of the Republic of Indonesia in ICCI LTD.
> 2. The payment of share value as defined in paragraph (1)(a) shall be made with regard to all shares that have been issued to and paid for by the shareholders.
>
> .   .   .   .   .

The court finds that the evidence submitted establishes that defendants are "an agency or instrumentality of a foreign state" as defined in § 1603(b). Courts that have considered the sufficiency of proof required to establish foreign sovereign status under the FSIA have concluded that "statements of foreign officials ... have been accorded great weight in determining whether an entity is entitled to claim the protection of the FSIA." *S & S Machinery Co. Masinexpartimport*, 706 F.2d 411, 415 (2d Cir.1983); *O'Connell Machinery Co. v. M.V. Americana*, 566 F.Supp. 1381, 1384 (S.D.N.Y.1983). *See also Kane, Suing Foreign Sovereigns*, 34 Stan.L.Rev. 385, 421 (1982). In the court's opinion, the Presidential Regulation setting forth the national interests and directing the implementation of the purchase of stock from private owners to advance those national interests; the uncontradicted affidavit of the Consul that the transfer of stock directed in that regulation was effected on June 11, 1983 by payment to the shareholders (prior to the attachment at issue here) of their respective contributions to ICCI; and the further uncontroverted attestation by the Consul that ICCI became a wholly-owned corporation of the Republic of Indonesia by virtue of the Presidential Regulation and that ICCI owns a majority interest in JV, sufficiently evidences the type of ownership interest contemplated by § 1603(b)(2) of the FSIA. *See Id. See also* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 15–16, reprinted in 1976 U.S.Code Cong. & Ad.News 6604, 6614 (describing the type of economic entities the drafters of the legislation intended to include in the definition of agency or instrumentality) In addition, the § 1603(b)(2) definition at issue here has been interpreted as having been "designed to establish the degree of the foreign state's identification with the entity under consideration." *Yessenin-Volpin v. Novosti Press Agency*, 443 F.Supp. 849, 852 (S.D.N.Y.1978). Both the Presidential Regulation and the affidavit of the Indonesian Consul establish the close degree of identification with Indonesia which, in this court's opinion, was contemplated to establish foreign sovereign status under the FSIA.

Outbound submits no evidence to rebut the persuasive evidence submitted by defendants. Instead, Outbound argues that these documents fail to establish legal ownership of ICCI and JV by the Republic of Indonesia. Relying on Article 8 of the UCC, Outbound asserts that under United

States law, neither payment of the purchase price nor the transfer of shares would necessarily effect the transfer of legal title or legal ownership of the shares. Outbound further submits that although it has been unable to determine what would be required under Indonesian law to effect the transfer of legal title, something more than just the payment of the purchase price would be required.

The court finds Outbound's arguments unpersuasive. First, reliance on the complicated definitional concepts contained in Article 8 of the UCC, which deals with certificated domestic securities is misplaced. The Article 8 requirements are too arcane to apply to an issue under a completely different statutory scheme. Nothing in the legislative history of the FSIA or in the courts' treatment of economic entities claiming foreign status since the passage of the FSIA indicates that consideration of such concepts is required. *See Yessenin-Volpin v. Novosti Press Agency,* 443 F.Supp. at 853–854 (describing the difficulties of construing and applying the requirements of "ownership" under the FSIA to foreign entities). Similarly, the arguments advanced under theories of Netherlands commercial law (from which Indonesian law is allegedly derived) also lack merit. At most, such arguments would apply to establish priorities with respect to adverse claimants, an issue which is not before the court.

The FSIA was intended to bring the treatment of a foreign sovereign's claim of immunity in the courts of the United States into conformity with the treatment accorded to American entities claiming immunity in those nations' courts. 1976 U.S.Code Cong. & Ad.News, at 6605–06. An American entity claiming foreign sovereign status in a foreign court should be able to rely on evidence similar to that presented by the defendants here to obtain whatever protections such foreign status would entitle it to in the foreign jurisdiction. Submission of a regulation issued by an American President in conjunction with an affidavit from an American consul that the measures decreed in that regulation had been effected should suffice to establish that the American entity was an agency or instrumentality of the United States. In this court's opinion, these concededly authentic documents by officials of the Republic of Indonesia should be accorded great weight and should suffice to establish the defendants' status as an instrumentality of that republic. Moreover, this is a preliminary issue which does not interfere in any manner with the considered determination of the merits of this matter under the applicable law. Consequently, for all the foregoing reasons, the court finds that defendants have met their burden of showing that they are an "agency or instrumentality of a foreign state". 28 U.S.C. § 1603(b).

### Res Judicata

After the court had drafted the above memorandum, defendants' counsel informed the court, by letter dated March 1, 1983, that the federal district court for the Southern District of New York had ruled that the very contract at issue here is a maritime contract and that defendants had failed to prove their status as agencies or instrumentalities of a foreign sovereign. That decision, *Outbound Maritime Corp. v. P.T. Indonesian Consortium Construction Industries,* 575 F.Supp. 1222 (S.D.N. Y.1983), was issued on December 22, 1983, eight days before the hearing on the merits of defendants' motion to vacate the attachment was held by this court. Apparently, the New York court did not notify the parties that it had ruled in the matter. Outbound now asserts that the doctrine of *res judicata* should preclude this court from ruling in a manner inconsistent with the New York court.

The matter before the New York court is a claim identical to the one *sub judice.* Prior to or concurrently with the filing of the instant action, Outbound filed a breach of contract action against the defendants, invoking the maritime jurisdiction of the New York court. It involved the same parties, the same oral contract, the same alleged breach and the same prayer for relief. *Id.* The only difference between

the New York and the Maryland actions appears to be that in New York, Outbound obtained a maritime attachment of a bank account of the defendants. The decision rendered by the New York court was on "defendants' motion, by way of order to show cause, to vacate the attachment", *id.* at 1222, a motion identical to the one at issue before this court.

Preliminarily, the court notes its displeasure with the manner in which the parties have wasted valuable judicial resources. The initial hearing on the merits of the motion to vacate was held before this court eight days after the decision by the New York court had been issued. Neither at that hearing nor in any of the pleadings submitted to this court since that time, has either side raised the issue that the doctrine of *res judicata* might serve to preclude consideration of the issues under advisement by this court.

▇▇▇ The doctrine of *res judicata* serves to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). For the doctrine to be applicable, there must be: "(1) a final judgment on the merits in an earlier suit, (2) an identity of the cause of action in both the earlier and the later suit, and (3) an identity of parties or their privies in the two suits." *Nash County Board of Ed. v. Biltmore Co.,* 640 F.2d 484, 486 (4th Cir.1981). Since the decision by Judge Duffy in the New York case was not a final judgment, it does not appear that it has a *res judicata* effect with respect to the matters before this court. Moreover, since the New York opinion and its possible preclusive effect was not more timely brought to this court's attention, the benefits to be derived by application of the doctrine would not accrue even if the doctrine were applied at this time.

Both rulings by the New York court are interlocutory and subject to revision. Neither ruling is "final" within the meaning of 28 U.S.C. § 1291 and hence neither ruling has a *res judicata* effect. *Acha v. Beame,* 570 F.2d 57 (2d Cir.1978). Clearly, the determination with respect to the FSIA is subject to revision since the New York court found an absence of sufficiently persuasive proof, which could be cured by additional submissions by defendants. *See Dozier v. Ford Motor Co.,* 702 F.2d 1189, 1192 (D.C.Cir.1983). The opinion itself indicates the mutability of the decision. *Outbound Maritime Corp. v. P.T. ICCI,* 575 F.Supp. at 1225 ("... I find that defendants' motion to vacate the attachment *at this time* must be denied.") (emphasis supplied).

In addition, the proof before this court appears to be different than that before the New York court. In its opinion, the New York court noted that the affidavit of the Consul did not mention the defendant, JV. 575 F.Supp. at 1224. The affidavit before this court states at page 2 "JV is a joint venture entered into by ICCI ... ICCI owns a majority of the ownership interest in JV." Similarly, the New York court noted that while arrangements apparently were made to transfer all private interests to the government, the affidavit was "unclear [as to] whether this transfer was ever effectuated." *Id.* Yet, the affidavit before this court states: "The transfer of shares directed in the regulation was effected on June 11, 1983, by payment to the private shareholders of the amounts each paid in to ICCI." Affidavit at ¶ 2. Finally, the New York court indicated that the translation of the Presidential Proclamation before that court "contains numerous handwritten corrections and is not authenticated ..." and further commented that the copy received by the court was so poor "that the effective date of the Proclamation ... is not clear." *Id.* The document before this court is titled "Regulation of the Government of the Republic of Indonesia Number 19 year 1983", it does not contain any handwritten corrections, the copy is quite clear, and article 5 of the regulation dealing with the effective date of its enactment quite

clearly shows May 5, 1983 as the date of enactment.

Further, the New York court's reference to the failure of counsel for defendants to submit anything from the United States Department of State or from the Indonesian embassy does not appear significant to this court. First, the legislative history of the FSIA clearly indicates that the Act was intended to withdraw the executive branch from involvement with claims of immunity and place responsibility for such determinations with the judiciary, "thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process." 1976 U.S.Code Cong. & Ad.News at 6606. *See also* Dept. of State Public Notice No. 507, 1976 AMC 2362, 2364 (Nov. 10, 1976). In this court's view, an affidavit from the Indonesian consulate is no less an official document than an affidavit from the Indonesian embassy, and is not thereby entitled to any less weight. Also, the cases cited by the New York court in support of its finding that the affidavit of the Consul General was insufficient proof are all pre-FSIA cases, where different procedures were required to claim and be granted sovereign immunity.

With respect to the New York court's finding of maritime jurisdiction, the record before this court appears more fully developed on the issue of the non-maritime elements of the contract. A comparison of the transcript of the hearing held in New York on December 8, 1983 and of the transcript of the hearing before this court shows that the evidence on that issue was more substantially detailed and argued here. This is also evidenced by the fact that the New York court did not address the issue of whether non-maritime elements existed, and if so, whether they were incidental to or separable from the maritime elements of the contract.

Consequently, for all the foregoing reasons, the court is satisfied that the instant maritime attachment should be vacated both because (1) there is no maritime jurisdiction in this court since the contract at issue is not purely maritime and the non-maritime elements are not incidental to or separable from the maritime elements and (2) because the provisions of the Foreign Sovereign Immunities Act preclude the attachment of defendants' property prior to the entry of judgment. This court believes that the contrary decision of the New York court does not preclude this court from making the instant determination.

The court will enter a separate order embodying the rulings in this memorandum.