Michael J. CESARONI, Jr., and James L. Drake, Jr., Trustee, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. CV483–497.

United States District Court, S.D. Georgia, Savannah Division.

April 9, 1985.

Edwin D. Robb, Jr., Bouhan, Williams & Levy, Savannah, Ga., for plaintiff.

James L. Drake, Jr., intervenor, Savannah, Ga., pro se.

Damon C. Miller, Dept. of Justice, Civ. Div., Washington, D.C., Melissa Mundell, Savannah, Ga., for the U.S.

## ORDER

EDENFIELD, District Judge.

This litigation is before the Court for adjudication following a final hearing held on March 11, 1985.

## I. *Background*

### A. Procedural History

Plaintiff Michael J. Cesaroni, Jr. filed this action against defendant United States of America ("the Government") on November 16, 1983, claiming damages pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680. On February 17, 1984, plaintiff amended his complaint to add an alternative cause of action in contract under the Suits in Admiralty Act, 46 U.S.C. §§ 741–52. Defendant answered the complaint and the complaint as amended, and then moved to dismiss the case on the basis that this Court lacked subject matter jurisdiction to entertain the suit under either of plaintiff's theories. Plaintiff opposed the motion to dismiss.

Meanwhile, plaintiff's trustee in bankruptcy, James L. Drake, Jr., moved to intervene as a party plaintiff in this action, which motion was granted for the sole purpose of protecting creditors' interests.

On August 6, 1984, the Government filed a motion for summary judgment in accordance with its motion to dismiss. The Court ruled on both motions in an Order dated November 15, 1984, in which the Court dismissed without prejudice plaintiff's claim brought pursuant to the Federal Tort Claims Act, and allowed the case to proceed under admiralty jurisdiction conferred by the Suits in Admiralty Act. Moreover, the Court recognized that if trial on the merits of this case demonstrated facts giving rise to a non-maritime contract action, then the amount in controversy exceeds the amount that can be recovered in this Court pursuant to the jurisdictional limitations declared in the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491.

The case was tried without a jury on March 11, 1985, and on the basis of the pleadings, the briefs submitted both before and after trial, and the testimony heard and exhibits admitted, the Court finds the following facts pertinent to adjudication of plaintiff's claim.

## B. Facts

Plaintiff formerly owned several trawlers in connection with his shrimping business which he operated out of Thunderbolt, Georgia. At least during the period between late November and early December, 1981, plaintiff temporarily moved his shrimping operation to the Key West, Florida coastline, since the shrimp crop along the Georgia coast was depleted.

During this same period, plaintiff was approached by certain individuals who expressed interest in using one of his shrimp boats for smuggling purposes. (T. 18). Because plaintiff had served as a custodian for seized vessels in 1972 and 1973, he knew several United States Customs agents, one being Mr. Miles Knight in the Savannah, Georgia Customs Service office. (T. 19). Plaintiff telephoned Mr. Knight to inform him about the contact he had had with the purported drug smugglers. (T. 19).

Miles Knight has been employed with the Customs Service since 1971, and is currently an Intelligence Coordinator-Investigator with the Service. (T. 85). His immediate supervisor in the Savannah office in 1981 was Mr. Jerry Mooney, who at that time was a special agent in charge of the Tactical Enforcement Division (T. 85) for the State of Georgia. (T. 86). In turn, Mr. Mooney reported directly to Mr. Andy Hoffman in the Miami Regional office of the Customs Service. (T. 86). As a result of plaintiff's service to Customs as both a custodian of seized vessels and as a source of information regarding suspect vessels, Mr. Knight considered plaintiff a reliable informant as to smuggling operations. (T. 87).

Consequently, when plaintiff informed him that he had been approached by purported drug smugglers, Miles Knight advised plaintiff that he and Jerry Mooney would be in Miami, Florida on December 9, 1981, and that they should get together for dinner. (T. 20). Accordingly, plaintiff flew north to Miami on the evening of December 9 for the purpose of meeting with these gentlemen to discuss the proposed drug deal. (T. 20).

At this meeting, plaintiff explained to the Customs agents that the smugglers had expressed an interest in using one of his boats because plaintiff's fleet was relatively new, and these individuals were tired of using old boats. (T. 22). Plaintiff could not give details, such as when the smugglers wanted to use one of his boats; however, pursuant to his discussion with the Customs agents, plaintiff decided to oblige the smugglers if they did return. (T. 24).

Plaintiff made this decision on the basis that the Customs agents expressed interest in the deal, especially if it were transacted in Georgia, which would be a location more proximate to their office and thereby would afford them greater control in securing the return of plaintiff's vessel if it were seized. (T. 22). The agents assured plaintiff that media coverage of such a seizure would be held to a minimum (T. 23), and plaintiff would be absolved of any adverse publicity that might ensue upon an implication of his property being used in a smuggling operation. (T. 23). Finally, plaintiff was informed by the agents that he could receive monetary compensation ("moiety" or otherwise) from the Customs Service for his assistance in apprehending drug smugglers. (T. 23). The amount of compensation would range from 30,000 to 150,000 dollars, depending on whether the boat was arrested in the act of smuggling contraband onto the coastline, or at some other point in the smuggling act when seizure would result in less conclusive evidence. (T. 23). So as to assure himself the highest rate of compensation, plaintiff agreed to allow the Customs service to place a transponder on any vessel finally chosen by the purported smugglers. (T. 61).

At no time during their December 9, 1981 meeting did the customs agents inform plaintiff that they were without authority to enter into this proposed relationship. (T. 24).

In late December, 1981, plaintiff returned home to Thunderbolt, Georgia for the Christmas holiday. He had not heard

again from the purported drug smugglers; however, he did meet with Miles Knight and together they viewed several unloading sites along the Georgia coastline where smugglers might find private entrance to the mainland. (T. 25). Plaintiff had been informed by agent Knight that if one of his vessels were used in a smuggling transaction, it would be returned to him earlier after seizure if it landed in Georgia (3 to 5 days) rather than in Florida (possibly 45 days), a fact which encouraged plaintiff to steer the purported smugglers toward Georgia. (T. 23–26).

On January 12, 1982, plaintiff was contacted again by the purported smugglers. After looking over plaintiff's fleet, these individuals demonstrated particular interest in the RUBBER DUCK (T. 26) because of its fuel capacity. (T. 27). Plaintiff telephoned Miles Knight with this news, and the agent reminded him to contact the Customs Service at least twenty-four hours before the boat's departure so that a transponder could be placed on the vessel. (T. 26).

By Friday, January 15, 1982, the individuals had decided definitely on using the RUBBER DUCK. (T. 27). They approached plaintiff with this news that night, and maintained the secrecy of their decision by holding plaintiff at gunpoint through the weekend until they departed sometime on Sunday night (T. 28–29), at which time they gave plaintiff 10,000 dollars. (T. 31).

Soon after their departure, plaintiff telephoned Miles Knight with the brief message that the RUBBER DUCK was gone and that plaintiff would be in Savannah the following morning. (T. 31). On January 19, agent Knight met with plaintiff at his home, where plaintiff described the events that had occurred that weekend and the appearance of each individual whom he supposed had taken the RUBBER DUCK. (T. 33). He produced a nautical chart that had been left by these individuals (Plaintiff's Exh. 2) which depicted the course that the boat would travel up to the point of unloading. (T. 33). Agent Knight left this

meeting with the comment that they all would have to wait and see what happened next. (T. 33).

Because plaintiff had not been afforded the opportunity to contact agent Knight prior to the departure of the RUBBER DUCK, no transponder ever was placed on the boat. (T. 66). However, at no point did agent Knight state that this fact would affect the deal which plaintiff understood to have been arranged between himself and the Customs Service. (T. 33–35). Indeed, plaintiff testified that if he not had reason to expect compensation from the Customs Service, he would not have pursued this venture, which he perceived as a customs operation. (T. 62).

The source of this expectation, being moiety or some alternative reward proposed by agent Knight (T. 102), was compensation that agent Knight considered payable pursuant to the filing and approval of a Request for Purchase of Information Payment. (T. 103–04, Plaintiff's Exh. 14). Agent Knight testified that following his January 12, 1982 conversation with plaintiff, he contacted his immediate supervisor, Mr. Bill Arangio, whom he believed had spoken with Jerry Mooney about the proposal. (T. 106). Agent Knight understood from this conversation with Mr. Arangio that the use of plaintiff's boat had been approved by Mr. Mooney. (T. 105–06).

Although no transponder was placed on the RUBBER DUCK, agent Knight did send out an administrative message to all Customs Service seaport areas along the Atlantic and Gulf of Mexico coastlines to maintain a lookout for the vessel, following his conversation with plaintiff on January 19, 1982. (T. 110–11, Plaintiff's Exh. 13). Plaintiff had informed agent Knight that the boat was to travel a route from Santa Marta, Columbia to Camp Romano, Florida, where three lobster boats would receive the contraband loaded on the RUBBER DUCK and deliver it to three stash houses in the Camp Romano area for later distribution. (T. 110).

On February 3, 1982, the United States Coast Guard seized plaintiff's boat in the

Yucatan Peninsula with the smugglers and contraband on board. (T. 35–36, Plaintiff's Exh. 14). Plaintiff learned of the seizure on February 5 by way of a newscast over public television. (T. 35). Plaintiff then called Miles Knight, who instructed him to file a petition for return of the vessel. (T. 35–36). Accordingly, plaintiff through his attorney petitioned for release of the vessel in February, 1982.

Over the next several months, plaintiff had several conversations with Miles Knight and Jerry Mooney, in which he continued to request that the Customs Service return his boat. (T. 44). Meanwhile, as a result of media coverage of the event, plaintiff was implicated as a co-conspirator in illegal drug activities (Plaintiff's Exh. 4), which implications, according to the Customs agents who had received plaintiff's cooperation, were without any merit. (T. 111, Plaintiff's Exh. 15).

Moreover, the RUBBER DUCK was a new boat when purchased by plaintiff in March, 1980 (T. 13), having had a purchase price of 204,000 dollars and an approximate worth of 250,000 dollars after it was outfitted for use by plaintiff. (T. 14–15). Mortgage payments continued to be due on the boat throughout the period following its seizure in February, 1982 (T. 39), which payments could not be met by plaintiff while he was denied use of his boat for fishing purposes. (T. 39).

On November 30, 1982, a letter was sent by the United States Department of the Treasury to plaintiff's attorney explaining to him in part that

[n]o evidence has been presented which would indicate that petitioner [plaintiff] actively participated in or authorized the scheme to smuggle the marijuana into the United States.

Accordingly, the forfeiture of the RUBBER DUCK is remitted in favor of Mr. Cesaroni and will be released to him upon his execution of a hold harmless agreement.

(T. 44–45, Plaintiff's Exh. 7). Plaintiff refused to hold the Government harmless, as requested. (T. 45). Then in February, 1983, plaintiff received notice of a teletyped authorization allowing him unconditional remission of the forfeiture, and stating that the RUBBER DUCK should be released to plaintiff as soon as possible. (T. 45, Plaintiff's Exh. 10). However, before he could get to his boat which was supposed to be docked and under the custody of the Customs Service in Miami, Florida, the vessel was seized for foreclosure purposes, according to the customs agent who met him when he arrived. (T. 41). The RUBBER DUCK was sold to a third party in a foreclosure sale on June 9, 1983. (T. 42, Plaintiff's Exh. 11).

Jerry Mooney, who remains an agent with the United States Customs Service, admitted at trial that the first time he and Miles Knight discussed with plaintiff the possibility of using one of his boats to apprehend drug smugglers, it was understood that some means of compensation would be paid to plaintiff in return for his cooperation with the Government. Indeed, on February 25, 1983, Mr. Mooney stated in a Request for Purchase of Information Payment (Plaintiff's Exh. 14) that plaintiff

has suffered a tremendous financial loss and negative publicity in the press because his role as a CI [Confidential Informant] was never publicly revealed.

... I think the Customs Service has an obligation to Mr. Cesaroni. He came to us in a timely manner with valid information and he has suffered because of it.

No payment has been made to plaintiff by the Government pursuant to this request.

## II. *Law and Analysis*

Plaintiff proceeded to trial of this case under the aegis of the Suits in Admiralty Act, 46 U.S.C. §§ 741–742, on the theory that the Government, through its agents, entered into and breached an express or implied contract of charter or bailment of one of plaintiff's boats for the purpose of apprehending drug smugglers. The Government opposes this theory, contending that plaintiff has failed to demonstrate facts supporting the existence of a contract, that even if a contract did exist, it

was entered into without proper authority, and that this Court nevertheless is without power to decide this matter, according to the jurisdictional limitations declared in the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491. In that connection, the Court first must examine the jurisdictional issue. *Mansfield, Coldwater & Lake Michigan Railway v. Swan*, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884). *See* Fed.R.Civ.P. 12(h)(3).

"The United States, as sovereign, is immune from suit save as it consents to be sued ..., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980), *quoting United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). *Accord, Stanley v. Central Intelligence Agency*, 639 F.2d 1146, 1156 (5th Cir. Unit B 1981). Where no such consent exists, a district court has no jurisdiction to entertain a suit against the United States. *Mitchell, supra*, 445 U.S. at 538, 100 S.Ct. at 1351; *United States v. King*, 395 U.S. 1, 2–5, 89 S.Ct. 1501, 1502–03, 23 L.Ed.2d 52 (1969); *Stanley, supra*, 639 F.2d at 1156. "It is incumbent on a court of the United States, whether trial or appellate, to dismiss an action whenever it appears that subject matter jurisdiction [as prescribed by Congress] is lacking...." *Marshall v. Gibson's Products, Inc. of Plano*, 584 F.2d 668, 671–72 (5th Cir.1978).

The Suits in Admiralty Act is a legislative waiver of sovereign immunity under specified circumstances. A brief history of that Act, pertinent to undertaking its application, is explained in *McCormick v. United States*, 680 F.2d 345 (5th Cir.1982):

> Prior to 1916, the doctrine of sovereign immunity barred any suit by a private owner whose vessel was damaged by a vessel owned or operated by the United States. Recognizing the inequities of denying recovery to private owners and the difficulties inherent in attempting to grant relief to deserving private owners through private Acts of Congress, Congress provided in the Shipping Act, 1916, that Shipping Board vessels employed as merchant vessels were subject to "all laws, regulations, and liabilities governing merchant vessels." In *The Lake Monroe*, 250 U.S. 246, 39 S.Ct. 460, 63 L.Ed. 962 (1919), [the Supreme] Court held that the Shipping Act had subjected all Shipping Board merchant vessels to proceedings *in rem* in admiralty, including arrest and seizure. Congress, concerned that the arrest and seizure of Shipping Board merchant vessels would occasion unnecessary delay and expense, promptly responded to the *Lake Monroe* decision by enacting the Suits in Admiralty Act. The Act prohibited the arrest or seizure of any vessel owned by, possessed by, or operated by or for the United States. 46 U.S.C. § 741. In place of an *in rem* proceeding, the Act authorized a libel *in personam* in cases involving such vessels, if such a proceeding could have been maintained had the vessel been a private vessel, and "provided that such vessel is employed as a merchant vessel." 41 Stat. 525, 46 U.S.C. § 742 (1958 ed.)....

*Id.* at 348, *quoting United States v. United Continental Tuna*, 425 U.S. 164, 170–71, 96 S.Ct. 1319, 1323–24, 47 L.Ed.2d 653 (1976).

One effect of this Act was to confuse litigants as to the appropriate forum in which to bring a maritime contract claim against the United States. Specifically, the Tucker Act, initially passed by Congress in 1887, *United States v. King*, 395 U.S. 1, 3, 89 S.Ct. 1501, 1502,. 23 L.Ed.2d 52 (1969), lodged exclusive jurisdiction in the Court of Claims for contract claims against the Government exceeding 10,000 dollars. 28 U.S.C. §§ 1346(a)(2), 1491; *United Continental Tuna, supra*, 425 U.S. at 172, 96 S.Ct. at 1324. "A plaintiff with a contract claim against the United States for more than $10,000 often found himself in a difficult position. He had to choose between proceeding in the district court under [the Suits in Admiralty Act], and proceeding in the Court of Claims under the Tucker Act," *United Continental Tuna*, 425 U.S. at 172–73, 96 S.Ct. at 1324–25, and either course could lead to a perilous result. *See Calmar S.S. Corp. v. United States*, 345 U.S. 446, 73 S.Ct. 733, 97 L.Ed. 1140 (1953).

■ The Suits in Admiralty Act was amended in 1960 to alleviate the perceived difficulty in determining the appropriate forum for a maritime claim against the United States. The change that concerns the Court in this case [1] was the deletion of the language requiring that a vessel be "employed as a merchant vessel." By that amendment, Congress effectively expanded the scope of the Suits in Admiralty Act at the expense of the Tucker Act. *United Continental Tuna*, 425 U.S. at 179, 96 S.Ct. at 1328. If the claim is a contract claim exceeding 10,000 dollars, then the exclusive jurisdiction is in the Court of Claims.[2] If, on the other hand, the contract is in admiralty, then exclusive jurisdiction is conferred on the district court. *Amell v. United States*, 384 U.S. 158, 159–60, 86 S.Ct. 1384, 1385, 16 L.Ed.2d 445 (1966); *DeBardeleben Marine Corp. v. United States, supra*, 451 F.2d at 143–44. In either situation, the contract that plaintiff is relying upon must be recognized specifically as a contract enforceable against the Government.

■ Before the Court may reach the merits of plaintiff's contract claim, however, it first must be determined whether this matter falls within the exclusive realm of admiralty jurisdiction for purposes of construing the facts under the Suits in Admiralty Act. "Calling a contract a maritime contract does not make it one." *Kennedy v. H & M Landing, Inc.*, 529 F.2d 987, 988 (9th Cir.1976) (held that neither a

city-issued permit allowing a seller to sell bait to such persons as were willing to buy it for use on vessels at such times and places as the purchasers might elect, nor an oral contract binding a seller to furnish bait to a sport-fishing enterprise, but not obliging seller to provision a particular vessel or imposing any duty on the enterprise to buy bait, were maritime contracts). Whether a contract action falls within admiralty jurisdiction depends upon the subject matter of the contract, rather than the place where the contract was entered into or was performed. *Luvi Trucking, Inc. v. Sea-Land Service, Inc.*, 650 F.2d 371, 373 (1st Cir.1981), *citing* E.E. Jhirad & A. Sann, 1 Benedict on Admiralty § 182 at 11–5 (6th ed. 1983) (hereinafter "Benedict").

> Maritime character of the nature to attract admiralty jurisdiction does not attach to a contract merely because the services to be performed under the contract have reference to a ship, or to its business, or that the ship is the object of such services or that it has reference to navigable waters. In order that such character should attach, there must be present a direct and proximate jurisdictional link between the contract and the operation of the ship, its navigation or its management afloat, taking into account the developing practices of world shipping, for the very basis of the constitutional grant of judicial power upon the United States in respect of matters maritime was to ensure a national uniformity of approach to world shipping.

---

1. The Court notes that the 1960 amendments to the Suits in Admiralty Act also extended the coverage of that Act to include all maritime tort claims against the United States where the plaintiff would have an action in admiralty were the defendant a private person rather than the government. *McCormick v. United States*, 680 F.2d 345, 349 (5th Cir.1982); *DeBardeleben Marine Corp. v. United States*, 451 F.2d 140, 145 (5th Cir.1971). However, plaintiff has never stated a tort claim under the Suits in Admiralty Act, and the case was tried pursuant to his claim for breach of contract. Accordingly, the Court restricts its analysis and judgment to the facts and law as they pertain to an action in contract.

2. The Tucker Act provides both the requisite consent to be sued and the jurisdictional basis

for such actions at 28 U.S.C. §§ 1346(a)(2) and 1491. *A.L. Rowan & Son v. Dept. of Housing and Urban Development*, 611 F.2d 997, 999 (5th Cir.1980). 28 U.S.C. § 1346(a)(2) provides in pertinent part:

> (a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:
>
> (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, ...

*Luvi Trucking, Inc., supra,* 650 F.2d at 373, *quoting* 1 Benedict § 183 at 11–7–8.

"The boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." *Kossick v. United Fruit Co.,* 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961); *Outbound Maritime Corp. v. P.T. Indonesian Consort,* 582 F.Supp. 1136, 1140 (D.Md.1984). Reference to precedent and usage are helpful insofar as they exclude or include certain common types of agreements. *See generally* Annot., 29 A.L.R. Fed. 325 (1976). For example, contracts for the sale of vessels are not within admiralty jurisdiction, but charter parties are. *Clem Perrin Marine Towing v. Panama Canal Co.,* 730 F.2d 186, 188 (5th Cir.1984). A contract for the carriage of goods by sea is clearly maritime in nature. *Swift & Co. Packers v. Compania Columbiana del Caribe,* 339 U.S. 684, 691, 70 S.Ct. 861, 866, 94 L.Ed. 1206 (1949). On the other hand, contracts "preliminary to," rather than involving the maritime activity itself, are not within maritime jurisdiction. *Outbound Maritime Corp., supra,* 582 F.Supp. at 1141. "The rationale for this distinction is that although these preliminary services relate to the business of the ship, they are essentially no different from services ordinarily performed by other shoreside persons who are not involved in the operation or navigation of the ship." *Id., citing P.D. Marchessini & Co. v. Pacific Marine Co.,* 227 F.Supp. 17, 18 (S.D.N.Y.1964).

█ As to this case, plaintiff alleges that a charter party or bailment contract existed between himself and the Government, through its agents. The Court first recognizes that a charter party is a maritime contract; however, calling an agreement a "charter party" does not necessarily make it one. A charter party is ordinarily a contract between two parties having to do with the use and operation of a sea-going vessel. *Dorsey v. State Mutual Life Assur. Co. of Worcester, Mass.,* 238 F.Supp. 391, 394 (N.D.Ga.1964), *aff'd.,* 357 F.2d 600 (5th Cir.1966). More particularly, *Leary v. United States,* 81 U.S. 607, 20 L.Ed. 756 (1871) held:

> The question as to the character in which the charterer is to be treated is, in all cases, one of construction. If the charter-party let the entire vessel to the charterer with a transfer to him of its command and possession and consequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated. But, on the other hand, if the charter-party let only the use of the vessel, the owner at the same time retaining its command and possession and control over its navigation, the charterer is regarded as a mere contractor for a designated service, and the duties and responsibilities of the owner are not changed. In the first case, the charter-party is a contract for the lease of the vessel; in the other, it is a contract for a special service to be rendered by the owner of the vessel.

Essentially, a charter party confers either one or the other contracting party with control of the vessel and its navigation.

█ Similarly, to create a bailment, express or implied, there must be an actual or constructive delivery of the goods with actual or constructive possession in the bailee, exclusive and independent of the bailor and all other persons. *Davidson v. Ramsby,* 133 Ga.App. 128, 131, 210 S.E.2d 245 (1974); *see* O.C.G.A. § 44-12-40 (1982).[3] Delivery, which confers on the bailee an independent and temporarily exclusive possession, is essential to a contract of bailment. *Hartley v. Robinson,* 78 Ga. App. 594, 595, 51 S.E.2d 617 (1949).

█ It follows that control of the thing delivered by one party to the other is an element shared by both charter and bailment contracts. There is no evidence in the present case to support a finding that either plaintiff or the Government had control of the RUBBER DUCK or its naviga-

3. Although in admiralty, maritime law maintains a paramount position by virtue of the Constitution, state law has sometimes been used as a guide to substantive rights. *DeBardeleben Marine Corp. v. United States, supra,* 451 F.2d at 147 n. 17.

tion during the attempted drug smuggling operation. Rather, plaintiff was forced at gunpoint to deliver his boat to a third party, at which time both plaintiff and the Government through its agents relied on that party's nautical chart to determine where the boat would be steered. These circumstances, to a less drastic extent, had been foreseen by both plaintiff and the Government; indeed, their plan of operation had included failed methods of bringing some control over the vessel, whether by a transponder marking its course, or persuading the smugglers to complete their mission somewhere on the Georgia coastline. In the end, however, neither plaintiff nor the customs officers could escape the reality that they would have to "wait and see what happened next," once the smugglers took control of the vessel.

This analysis, however, does not foreclose the possibility that an enforceable contract is supported by the facts of this case. Indeed, it is one of the duties of the Customs Service "to use all necessary force to seize or arrest" violators of the revenue laws, which generally prohibit smuggling activities. 19 U.S.C. § 1581. Search and board statutory authority for officers of customs, 19 U.S.C. § 1581(a), provides in pertinent part: "At any time go on board of any vessel ... at any place ... within the customs waters or, *as he may be authorized ... at any other authorized place*, without as well as within his district, and examine the manifest and other documents and papers...." (emphasis added). Title 19 U.S.C. § 1401(j) defines customs waters as "the waters within four leagues [12 miles] of the Coast of the United States." Accordingly, it may be argued that once plaintiff and the Government entered into their deal to apprehend certain drug smugglers, pursuant to plaintiff's reliable information, the Customs Service had

plenary authority to go on board and search the RUBBER DUCK at any point it travelled ·during the smuggling venture. Indeed, it was on the basis of this cooperative effort between a citizen and the Government that Customs agent Jerry Mooney expressed his plea that some means of compensation be paid in accordance with a Request for Purchase of Information Payment, as authorized under 19 U.S.C. § 1619:

> Any person not an officer of the United States ... who furnishes ... to any customs officer original information concerning any fraud upon the customs revenue, or a violation of the customs laws ... perpetrated *or contemplated*, which detection and seizure of information leads to a recovery of any duties withheld, or any fine, penalty, or forfeiture incurred, may be awarded and paid by the Secretary of the Treasury a compensaton of 25 per centum of the net amount recovered, but not to exceed $50,000 in any case.... (emphasis added).

The evidence in this case clearly supports a finding that plaintiff provided the Customs Service with original information which proximately resulted in the seizure of certain drug smugglers and contraband intended for distribution in the United States. Moreover, plaintiff's acts were not performed gratuitously: he expected compensation and the immediate return of his boat.[4] However, what concerns this Court as to these elements of contract is not whether they constitute an enforceable agreement, but whether they characterize a maritime activity, conferring admiralty jurisdiction.

Stated simply, the agreement at issue involved the offer of reliable information in exchange for compensation. Such agreement, albeit one-sided, was entered into at

---

**4.** The Court notes that the lack of control by the Government over its part of the deal is demonstrated most clearly by the delay plaintiff suffered before his boat was released after seizure. Such delay was effected by the forfeiture proceedings that typically occur when the Attorney General, who is accorded custody of seized property, has probable cause to believe that the property seized has been used or is intended to be used in violation of the Drug Abuse Prevention Act, 21 U.S.C. § 881. Forfeiture actually occurs at the moment of illegal use, *see United States v. One Piece of Real Estate,* 571 F.Supp. 723 (W.D.Tex.1983), and the seized property is subject to Government process unless an innocent owner prevails under the defense prescribed in § 881(a)(4)(B). *See United States v.*

great expense to plaintiff, who eventually lost both his property and his reputation. Nevertheless, the agreement had its basis not in the operation of a ship, its navigation, or its management afloat, but in the unique duty of the Customs Service to protect Government revenues and our people generally from the effects of smuggling activities. Conclusively, the question of its enforceability is to be decided in law, rather than in admiralty.

III. *Conclusion*

Having determined that the claim presented by plaintiff in his complaint and supported by testimony and exhibits admitted at trial is based on a non-maritime agreement, the Court finds itself without power to reach its merits. This action therefore is dismissed, without prejudice or further delay, so that plaintiff may pursue his cause of action, with vigor, before the Court of Claims.

*One (1) 1980 Stapleton Pleasure Vessel,* 575 F.Supp. 473 (S.D.Fla.1983).

