**HINKINS STEAMSHIP AGENCY,**
**Plaintiff,**

v.

**FREIGHTERS, INC., Defendant.**

**No. C–71 2405 ACW.**

United States District Court,
N. D. California.

Nov. 30, 1972.

Hamilton & King, by William H. King, San Francisco, Cal., for plaintiff.

Lawrence E. Alioto, San Francisco, Cal., for defendant.

## MEMORANDUM OPINION DENYING DEFENDANT'S MOTION TO DISMISS AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

WOLLENBERG, District Judge.

Defendant has filed a motion to dismiss alleging that the contract sued upon is not within the admiralty and maritime jurisdiction of the federal courts. (28 U.S.C. § 1333) The basis for this interpretation of the contract is that plaintiff, by the language of the complaint, describes itself as an agent for the performance of maritime services rather than a performer of such services itself. Defendant relies on Cory Brothers & Co. v. United States, 51 F.2d 1010 (2d Cir. 1931), which in turn discusses The Thames, 10 F. 848 (D.C.Cir. 1881), and Minturn v. Maynard, 58 U.S. (17 How.)

476, 15 L.Ed. 235 (1855). See also P.D. Marchessini & Co. v. Pacific Marine Corp., 227 F.Supp. 17 (S.D.N.Y.1964). From these cases, defendant draws a distinction between contracts for preliminary services leading to maritime contracts and maritime contracts themselves. *The Thames* involved a shipping broker; *Minturn* and *Marchessini* involved general, continuing agency agreements. *Cory Brothers* itself involved a contract employing the libelant as cargo agent at several ports. The Court indicated that it was unclear from the contract whether libelant should perform stevedoring services itself or should engage others to do so, and commented that "If the contract merely employed libelant to procure maritime services instead of obligating it to perform them itself, it may well be that a suit to recover compensation and disbursements would be not of maritime cognizance." (51 F.2d at 1012) But the Court did not decide that issue, finding that jurisdiction existed independently under the Tucker Act.

■■ Two questions are raised by defendant's reliance on *Cory.* The first is whether the distinction recognized in *Cory* has continuing validity.[1] The second is whether, assuming the validity of *Cory* the services performed by libelant here are themselves preliminary or maritime. Plaintiff correctly points out that the settled law in the United States is that jurisdiction of admiralty in matters of contract depends upon the subject matter of the contract. If the subject matter of the contract is the repair or refitting of a ship, the contract unquestionably falls within the Court's maritime jurisdiction. North Pacific Steamship Co. v. Hall Brothers Marine Railway & Shipbuilding Co., 249 U.S. 119, 125, 39 S.Ct. 221, 63 L.Ed. 510 (1919); O'Leary v. Puget Sound Bridge & Dry

Dock Co., 349 F.2d 571, 574 (9th Cir. 1965); 1 Benedict on Admiralty § 62 (1940), and cases cited in § 62, n. 32 (Supp.1971). Plaintiff further contends that under Archawski v. Hanioti, 350 U. S. 532, 535, 76 S.Ct. 617, 620, 100 L.Ed. 676 (1956), if the claim asserted in the case at bar "arises out of a maritime contract, the admiralty court has jurisdiction over it."

The difficulty with applying this analysis to the present case is that it begs the question of whether a contract between a local husbanding agent and a shipowner or general agent under which the husbanding agent procures and supervises a variety of services[2] is itself a maritime contract. If so, then the failure to pay the full value of services rendered under the contract is a claim in admiralty.

None of the cases cited to the Court present this precise question. *Archawski,* upon which plaintiff relies so heavily, held that "admiralty has jurisdiction, even where the libel reads like *indebitatus assumpsit* at common law, provided that the unjust enrichment arose as a result of the breach of a maritime contract." (350 U.S. at 536, 76 S.Ct. at 621) *North Pacific Steamship Co.* held that a contract to repair a ship in dry dock was essentially a maritime contract.

In Interocean Steamship Corporation v. Amelco Engineers Co., 341 F.Supp. 995 (N.D.Cal.1971), this Court per Peckham, J., held that an oral contract giving plaintiffs the right to act as agents for a vessel in connection with its loading and discharging arose out of a maritime contract—plaintiffs' contract with the United States government to provide exclusive sea transportation services to the United States Trust Territory of the Pacific Islands. Consequently, the oral

---

1. This Court has expressed the view that the present vitality of *Minturn* and *Cory Bros.* "is at best questionable." Interocean Steamship Corp. v. Amelco Engineers Co., 341 F.Supp. 995, 998 (N.D. Cal.1971).

2. Plaintiff procured and supervised dockage, pilotage, tug assisting, line handlings, cargo discharge, discharging of deep tanks, sounding of fuel tanks, cleaning of holds, providing supplies and handling of operating details pertaining to the S.S. PINE TREE STATE's call in Baltimore.

contract, like the contract before the court in Amerind Shipping Corp. v. Jordan International Co., 314 F.Supp. 1324 (E.D.La.1970) was cognizable under the Court's maritime jurisdiction. In so holding, the Court distinguished P. D. Marchessini & Co., Inc. v. Pacific Marine Corp., 227 F.Supp. 17 (S.D.N.Y.1964) on the grounds that "whether the claim itself, in the abstract, is or is not, strictly speaking, a 'maritime claim' is not dispositive" (341 F.Supp. at 998) because the claim arose out of a contract which was clearly maritime.

*Marchessini* begins with the premise that "the test to be applied in deciding whether or not a contract is maritime is its nature and subject matter." (227 F. Supp. at 18) The Court then proceeds to examine the functions the libelant was to perform under a general agency agreement. One of these functions was to "make suitable arrangements for the husbanding of vessels and solicitation of cargoes." By "husbanding" the Court meant taking "care of the shoreside business of the ship and [taking] no part in the actual management or navigation of the vessel." (227 F.Supp. at 19, quoting Erlandson v. Commissioner, 277 F.2d 70, 71 [9th Cir. 1960]). The Court held that these "shoreside functions", and others such as collecting freights and other receipts, and submitting accounts, were of a preliminary character and therefore nonmaritime.

*Marchessini* can be distinguished from the present case on the grounds that the services performed there were primarily "shoreside" although one function was to arrange for husbanding. There was a continuing relationship between the agent and the principal. In the present case, on the other hand, the services provided by Hinkins (see footnote 2, *supra*) were necessary for a specific voyage of the ship. They were not part of a continuing relationship between Hinkins and Freighters, Inc. Moreover, Hinkins' personnel did not merely arrange for the services of others, but supervised these services directly and were repeatedly in attendance on board the vessel. (Affidavit of Charles J. Caulfield, Executive Vice President of Hinkins Steamship Agency, Inc., filed Nov. 29, 1972). Hence, Hinkins was more directly involved in the repairing and servicing of the vessel than was the general agent in *Marchessini* or *Cory Brothers*.

These distinctions are sufficient to take this contract out of the "preliminary" or "shoreside" category, and put it within the maritime jurisdiction. This conclusion is compelled by the federal interest underlying maritime jurisdiction which "can best be implemented by thus dealing with the major concerns of the shipping industry—with all of them, and not just with a few of them selected on antiquarian criteria." [Gilmore & Black, The Law of Admiralty § 1–10 (1957)]. It is difficult to imagine a relationship of more direct concern to the shipping industry than the relationship between a supervising, local husbanding agent and a general agent. Consequently, to the extent that *Cory Brothers* has continuing validity, it is distinguishable from the present case. The motion to dismiss is therefore denied.

Plaintiff's motion for summary judgment contends that there are no disputed factual issues. Defendant's pretrial statement, filed October 26, 1972, sets out the following as undisputed facts:

In December of 1970 and January of 1971, Plaintiff performed certain services upon the SS PINE TREE STATE in Baltimore, Maryland. Advance payment for such services in the amount of $20,000 was paid to Hinkins by Bulk Food Carriers, Inc. of San Francisco. The total claimed value of the services performed by Hinkins is $28,227.61.

On January 25, 1971, plaintiff Hinkins billed Bulk Food Carriers for the difference of $8,227.61. That amount has not been paid.

In addition, defendant lists the following issues as disputed:

a) Whether Bulk Food Carriers had any authority to bind Freighters, Inc. to plaintiff.

b) Whether there is any agency or management agreement of whatsoever nature between Freighters, Inc. and Bulk Food Carriers.

c) Whether Bulk Food Carriers was at the times pertinent hereto in a position of possible conflict with defendant Freighters, Inc., and whether for that reason Freighters, Inc. expressly withheld from Bulk Food Carriers any authority on the part of Bulk Food Carriers to bind Freighters, Inc.

Defendant thus disputes the alleged agency relationship between Freighters and Bulk Food, but does not contest that the services listed in Exhibit A to the complaint were fully performed, or that the charges for such services were reasonable. (See Affidavit of Lawrence C. Howard, Jr., President of Hinkins Steamship Agency, Inc., filed September 6, 1972).

Upon examination of all the depositions, affidavits, and exhibits in the file, the Court has concluded that an agency relationship existed between Freighters, Inc., and Bulk Food Carriers, Inc.; Hinkins was entitled to rely and did rely on that agency relationship in performing services on the SS PINE TREE STATE.

It is uncontested that Freighters has a management-agency agreement with an operating company called Elvalsons. Bulk Food Carriers, Inc., is a wholly owned subsidiary of Elvalsons, and shares office space with Elvalsons. The two companies have much the same administrative and management personnel.

The deposition of Charles E. Coombes, Assistant Operations Manager of Elvalsons in December, 1970, and the affidavits of S. J. Valentine, Vice President of Elvalsons from 1970 through the present, and Elmo E. Ferrari, President and Chief Executive Officer of Freighters, Inc. from 1969 through March 1, 1971, and President of Elvalsons in December, 1970, establish that the husbanding services performed by Elvalsons pursuant to its management agreement with Freighters, Inc., including the arrangements for the husbanding of the SS PINE TREE STATE by plaintiff were performed by Elvalsons under the name of Bulk Food Carriers, Inc., as its subagent and wholly-owned subsidiary. Moreover, it was the regular custom of Elvalsons to arrange for such husbanding services in the name of Bulk Food, and this custom and practice was at all times known to and approved by Elmo Ferrari as President and Chief Executive Officer of Freighters, Inc.

In addition to the statements by these three men, the record contains the letter requesting plaintiff's services. It is on the stationery of Bulk Food Carriers, Inc., is signed by Chas. E. Coombes, Assistant Operations Manager, and states in part: "The S/S Pine Tree State is under Time Charter to Freighters, Inc. Bulk Food Carriers, Inc. is the operating Agent for Freighters, Inc." (Exhibit A to Defendant's Memorandum in Opposition to the Motion for Summary Judgment) A second letter, on the stationery of Freighters, Inc., and signed by John L. Alioto was sent to Hinkins stating in part: "In accordance with the request of our auditors, Main Lafrentz & Co., we ask that you please confirm to them the correctness of an open account payable to you which, according to our records, at June 30, 1971 amounted to $8,227.61." (Exhibit I to Defendant's Memorandum)

Moreover, the business records of Hinkins indicate that Fred Furtz, Treasurer of Hinkins telephoned John Alioto on April 5, 1971 to request payment from him. It states: "Mr. Alioto advises that Freighters Inc. are short of funds but that he was mailing a check this week for 10% to all creditors and that we would receive $822.76. The balance he expects to pay by 5/1/71." (Exhibit H to Defendant's Memorandum) This notation was generally corroborated by Mr. Alioto in his deposition of June 19, 1972, 11:9–28, although Mr. Alioto did not recall the specific details of the conversation.

The only evidence defendant has submitted which challenges plaintiff's showing is the deposition and affidavit of

John L. Alioto. The Alioto affidavit does not controvert plaintiff's testimony in any respect; it merely recites that Mr. Alioto has no knowledge of the crucial factual contentions. The Alioto deposition, on the other hand, makes the flat assertion that no agency agreement ever existed between Freighters, Inc., and Bulk Food. (Deposition, 10:12–16, 16:3–6) But when pressed as to the source of his information in this regard, Alioto said his source was general knowledge of the company. (Dep. 16:9) He also stated that he became President of Freighters, Inc., in March, 1971 (Dep. 16:15), that prior to that time Elmo Ferrari probably would have been in charge of arranging for husbanding of Freighters' ships (Dep. 14:9–12), and that he has no knowledge as to Ferrari's practices in arranging for husbanding. (Dep. 14:17–18) This testimony thus does not controvert plaintiff's evidence in any material respect.

The motion for summary judgment is, therefore, granted. This Memorandum shall constitute the findings of fact and conclusions of law required by Rule 52. Plaintiff shall submit a proposed form of judgment.