**E.S. BINNINGS, INC.,
Plaintiff-Appellee,**

**v.**

**M/V SAUDI RIYADH, her engines, boilers, tackle, furniture, apparel, etc., in rem., Defendant,**

**The National Shipping Company of Saudi Arabia, Claimant-Appellant.**

No. 86–8502.

United States Court of Appeals, Eleventh Circuit.

April 29, 1987.

Rehearing and Rehearing En Banc Denied June 5, 1987.

---

Robert S. Glenn, Jr., Savannah, Ga., Donald J. Kennedy, Haight, Gardner, Poor & Havens, Mark C. Flavin, New York City, for claimant-appellant.

Edward T. Brennan, Brennan, Harris & Rominger, Savannah, Ga., Michael W. Lodwick, O'Neil, Eichin & Miller, New Orleans, La., for plaintiff-appellee.

Before HILL and JOHNSON, Circuit Judges, and HENLEY *, Senior Circuit Judge.

JOHNSON, Circuit Judge:

Appellant, the National Shipping Company of Saudi Arabia ("NSCSA"), appeals from the district court's order granting a maritime lien in the amount of $85,530.75 against the NSCSA cargo liner the M/V Saudi Riyadh in favor of Appellee, E.S.

Binnings, Inc. ("Binnings"). We reverse and remand with instructions to dissolve the maritime lien and dismiss the action for lack of subject matter jurisdiction.

## I. BACKGROUND

Binnings is a Louisiana corporation that provides agency services to vessels in United States Gulf ports. NSCSA is a corporation organized under the laws of the Kingdom of Saudi Arabia. In 1981, NSCSA began providing regular cargo liner service between ports in the United States and Saudi Arabia. NSCSA hired F.W. Hartmann & Company, Inc. ("Hartmann"), a New York-based steamship agent, to serve as NSCSA's general agent with regard to liner activities in North America and to serve as NSCSA's equipment control agent for worldwide activities. The contract between Hartmann and NSCSA permitted appointment of subagents to perform Hartmann's work and Binnings was appointed subagent for the Gulf. Binnings provided four types of services as Gulf agent for NSCSA vessels: (1) cargo solicitation; (2) documentation services; (3) financial services; and (4) husbanding services. For its services, Binnings received a commission equal to a percentage of the net ocean freights manifested in Binnings' territory.[1]

Between 1981 and 1984, Hartmann's financial stability deteriorated and it fell into arrears in its payment of commissions to Binnings. Binnings' attempts to work out credit arrangements with Hartmann eventually failed and the relationship between Hartmann and Binnings was terminated in October 1984. On October 18, 1984, Binnings filed an in personam action against NSCSA in the United States District Court for the Eastern District of Louisiana seeking $411,584.14 in commissions due with regard to freight carried by various NSCSA vessels, as well as $58,527.03 in costs advanced on behalf of NSCSA and

---

* Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

**1.** The percentage varied with the type of cargo. The commission claimed by Binnings in this litigation is based on the 3% commission for general cargo. Binnings also received a monthly fee for equipment control and communication costs under the agreement.

$57,988.16 in communication costs and equipment fees. On August 30, 1985, Binnings filed the present in rem proceeding against the Saudi Riyadh and the vessel was arrested in the Port of Savannah. Binnings' in rem complaint asserted a maritime lien pursuant to the Federal Maritime Lien Act, 46 U.S.C.A. §§ 971–975 ("FMLA"), against the Saudi Riyadh in the amount of $85,530.75, representing its commissions due for cargo manifested on that vessel. Binnings' claim against the Saudi Riyadh did not include any claim for advances, costs or fees.

NSCSA obtained release of the vessel by posting security against Binnings' claim. NSCSA filed a claim to the vessel and filed a motion to vacate the arrest under Fed.R. Civ.P.Supp.Rule E, which was denied by the district court after an evidentiary hearing. NSCSA then filed an answer and asserted a counterclaim for withheld freight monies and wrongful arrest. Binnings' motion to sever the counterclaim and transfer it to the Louisiana in personam action was granted on February 27, 1986. On March 20, 1986, a bench trial was conducted in the in rem action and the district court entered an order on June 4, 1986, granting judgment against the Saudi Riyadh in the amount of $85,530.75. This appeal followed.

## II. DISCUSSION

■ NSCSA asserts that the district court lacked subject matter jurisdiction over this in rem action because Binnings' agency agreement is not a maritime contract and, therefore, is not within the district court's admiralty jurisdiction. Binnings argues that the district court had jurisdiction both because the agency agreement was maritime and because the claim was brought pursuant to the FMLA, which Binnings argues should be viewed as providing a separate basis for jurisdiction. The district court found that it had admiralty jurisdiction on both grounds asserted by Binnings. Because we find that Binnings' agency agreement was not a maritime contract and, therefore, could not provide a basis for the assertion of admiralty jurisdiction or give rise to a maritime lien under the FMLA, we reverse.[2]

**A. Jurisdiction Based on the Maritime Nature of the Contract**

■ Article III, Section 2, of the United States Constitution extends the judicial power of the United States to "all Cases of admiralty and maritime Jurisdiction," but does not attempt to further define the boundaries of this broad jurisdictional grant. In the area of contracts, the demarcation between maritime and nonmaritime concerns has focussed on "the nature of the contract, as to whether it have reference to maritime service or maritime transactions." *North Pacific S.S. Co. v. Hall Bros. Marine R. & Shipbuilding Co.*, 249 U.S. 119, 125, 39 S.Ct. 221, 223, 63 L.Ed. 510 (1918); *accord, Peralta Shipping Corp. v. Smith & Johnson (Shipping) Corp.*, 739 F.2d 798, 801 (2d Cir.1984), *cert. denied*, 470 U.S. 1031, 105 S.Ct. 1405, 84 L.Ed.2d 791 (1985). The mere fact a contract has some reference to a maritime matter, however, is not sufficient to bring it within admiralty jurisdiction:

> Maritime character of the nature to attract admiralty jurisdiction does not attach to a contract merely because the services to be performed under the contract have reference to a ship, or to its business, or that the ship is the object of such services or that it has reference to

2. Enforcement of a maritime lien through an in rem proceeding against a vessel such as the action involved in the present case can be maintained only within the district court's admiralty jurisdiction. *Todd Shipyards Corp. v. The City of Athens*, 83 F.Supp. 67, 75 (D.Md.1949) (enforcement of true maritime lien is exclusive jurisdiction of federal courts in admiralty); *accord*, 7A, J. Moore, Moore's Federal Practice para. C.02, at 609 (2d ed. 1983) ("A proceeding in rem can only be commenced in that federal district court within which the res subject to the lien is ... physically situate, and that Court must act within its admiralty jurisdiction in hearing the matter.") Therefore, in order for the district court to have entertained this action against the Saudi Riyadh, it must have had admiralty jurisdiction over the subject matter of the proceeding. No other basis for federal jurisdiction would be sufficient to support this in rem proceeding.

navigable waters. In order that such character attach, there must be present a direct and proximate juridicial [sic] link between the contract and the operation of the ship, its navigation or its management afloat. . . .

1 E. Jhirah, A. Sann, B. Chase & M. Chynsky, Benedict on Admiralty § 182, at 11–7 (7th ed. 1985) (hereinafter "Benedict").

◼ Application of the broad guiding principles of maritime contract jurisdiction has led to "fairly complete coverage of the primary operational and service concerns of the shipping industry, with a few anomalous exceptions." G. Gilmore & C. Black, The Law of Admiralty § 1–10, at 22 (2d ed. 1975). One of the "anomalous exceptions" is agency contracts. The general rule is that agency contracts by which a party agrees to solicit or procure freight, passengers, crew and supplies for a vessel are not deemed maritime in nature. 7A J. Moore, Moore's Federal Practice para. .250, at 3001 (2d ed. 1985); *accord, Peralta,* 739 F.2d at 802 (agency contract calling for husbanding of vessel is not within admiralty jurisdiction). Therefore, actions to recover commissions due under such agreements have been held to be outside the admiralty jurisdiction, *e.g., Minturn v. Maynard,* 58 U.S. (17 How.) 476, 477, 15 L.Ed. 235 (1855) (action by general agent or broker to recover accounts due for advances and commissions on disbursements did not involve maritime contract); *Brown v. West Hartlepool Steam Navigation Co.,* 112 F. 1018, 1018 (5th Cir.1902) (action by agent or broker based on contract in charter party to pay commission for procurement of charter party not maritime contract); and such agreements have been held incapable of giving rise to a maritime lien. *E.g., The J.C. Williams,* 15 F. 558, 560 (S.D.N.Y.1883) (commissions due agent or ship's husband for procuring charter and making advances do not give rise to maritime lien); *The Crystal Stream,* 25 F. 575, 576 (S.D.N.Y.1885) (action asserting lien for wages due agent for freight solicitation is not within admiralty jurisdiction because services are not maritime and therefore do not give rise to a lien); *The Humboldt,* 86 F. 351, 352 (N.D.Wash.1898) (action in rem

would not lie for breach of contract making person general passenger and freight agent because contract was not a maritime contract and therefore could not be basis of maritime lien); *The Atlanta,* 82 F.Supp. 218, 238 (S.D.Ga.1948) (no maritime lien for commissions for securing charter party).

The reason for excluding such contracts is the distinction long recognized in admiralty between contracts that involve preliminary services leading to maritime contracts and those that are themselves maritime. 7A J. Moore, *supra,* para. .250, at 3002 & n. 2. Although contracts for performance of preliminary services "relate to the business of the ship, they are essentially no different from services ordinarily performed by other shoreside persons who are not involved in the operation or navigation of the ship," and, therefore, are not maritime in nature. *Outbound Maritime Corp. v. P.T. Indonesian Consortium of Constr. Indus.,* 582 F.Supp. 1136, 1141 (D.Md.1984). The efficacy of this rule is the relatively clear line of demarcation that it provides for drawing the boundaries of admiralty contract jurisdiction:

> The distinction between preliminary services leading to a maritime contract and such contracts themselves have [sic] been affirmed in this country from the first, and not yet departed from. It furnishes a distinction capable of somewhat easy application. If it be broken down, [one cannot] perceive any other dividing line for excluding from the admiralty many other sorts of claims which have a reference, more or less near or remote, to navigation and commerce. If the broker of a charter-party be admitted, the insurance broker must follow—the drayman, the expressman, and all others who perform services having reference to a voyage either in contemplation or executed.

*The Thames,* 10 F. 848, 848 (S.D.N.Y.1881).

◼ Review of the services provided by Binnings under its agency agreement shows that those services are of the type traditionally held not to give rise to a maritime contract under the above principles. A contract is nonmaritime if "the functions

to be performed under the contract are 'of a preliminary nature and end when the freight is placed at the pier.'" *Outbound Maritime Corp.*, 582 F.Supp. at 1141 (quoting *Seawind Compania, S.A. v. Crescent Line, Inc.*, 211 F.Supp. 157, 159 (S.D.N.Y. 1962)). As discussed above, Binnings provided four types of services as Gulf agent for NSCSA vessels: (1) cargo solicitation; (2) documentation services; (3) financial services; and (4) husbanding services. The district court found that the specific services provided included coordinating vessel husbanding services, collecting documents and providing the necessary cargo-related documents for the cargo, soliciting cargo, responding to requests for information regarding arrival of vessels, freight rates and availability of vessels to carry particular cargo, collecting freights, remitting those freights to the principal, handling the flow of funds, including cash disbursements to the master and payment of the principal's bills, accounting and documentation services, clearing of vessels calling in the ports, attending to the needs of the crew and arranging tug service. All of these services clearly are shoreside and all have been held to be outside the admiralty jurisdiction. *E.g., Peralta*, 739 F.2d at 802; *P.D. Marchessini & Co. (New York) v. Pacific Marine Corp.*, 227 F.Supp. 17, 19 (S.D.N.Y.1964).

Despite this long-established rule, the district court found that it had admiralty jurisdiction over Binnings' contract under the former Fifth Circuit case of *Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697 (5th Cir.1961), and the district court decision in *Hinkins Steamship Agency, Inc. v. Freighters, Inc.*, 351 F.Supp. 373 (N.D.Cal. 1972), *aff'd*, 498 F.2d 411 (9th Cir.1974). *Hadjipateras* involved an action for breach of a contract for management and operation of a vessel. Under the contract, the managing agent operated the vessel, obtained freight or freight engagements, collected freight monies and, after deducting all operating expenses, remitted the balance to the owners. *Id.* at 700. The action was brought by the owners to recover money that had not been remitted by the managing agent. *Id.* The Court found that the contract was "everything classically known as a maritime contract." *Id.* at 703.

The district court interpreted *Hadjipateras* as holding that a contract for agency services was a maritime contract. We cannot agree. The agreement involved in *Hadjipateras* was a vessel management agreement, not a general agency agreement. The core of that agreement was the actual physical operation of the vessel by the agent. Thus, the contract clearly was not one that was merely preliminary to maritime activity. As the Court noted, "its very purpose [was] to effectuate the physical, economic operation and employment of a vessel." *Id.* at 703. Binnings' agreement does not involve management and operation of NSCSA vessels. It is merely an agency agreement providing for the performance of services that no doubt facilitate maritime activity but, under longstanding precedent, are not sufficiently related to actual maritime activity to support admiralty jurisdiction. *See,* G. Gilmore & C. Black, *supra,* § 1–10, at 28 (vessel management agreement is within admiralty jurisdiction while general agency agreement is not); 7A J. Moore, *supra,* para. .250, at 3002–03 (general agency agreements and brokerage agreements are nonmaritime, but when agent in fact agrees to operate vessels rather than arrange for operation by others agreement is maritime).[3]

---

**3.** The importance to the *Hadjipateras* decision of the nature of the contract as a vessel management agreement is underlined by that Court's reference to the case of *United Fruit Co. v. United States Shipping Bd Merchant Fleet Corp.,* 42 F.2d 222 (D.Mass.1930), as the case constituting the "closest example" to the situation in *Hadjipateras. Hadjipateras,* 290 F.2d at 703 n. 14. *United Fruit* also involved an agreement pursuant to which the plaintiff had undertaken to operate vessels as agent for the owner. *Id.* at 223. The plaintiff, who had not brought the action in admiralty, attempted to argue that the contract was not within the admiralty jurisdiction because under the contract the plaintiff was "hardly more than an agent for the solicitation of cargo, issuing bills of lading, and for the collection of freight." *Id.* at 225. The court rejected that argument, however, because it found that the agreement to operate the vessels was similar to a charter party and, therefore,

Nor do we find the approach taken by the district court and the Ninth Circuit in *Hinkins* persuasive on the facts of this case. In *Hinkins*, the district court found that a contract pursuant to which services as husbanding agent were performed for one ship in connection with a specific voyage at the request of the operating agent of the vessel owner was within the court's admiralty jurisdiction. 351 F.Supp. at 375. Both the district court and the Ninth Circuit in upholding the district court's decision stressed the fact that the services provided were not part of a continuing relationship between the husbanding agent and its principal, but rather related specifically to one particular voyage of a vessel and that the actual performance of husbanding services was supervised directly by the husbanding agent. *Hinkins*, 351 F.Supp. at 375; *Hinkins Steamship Agency, Inc. v. Freighters, Inc.*, 498 F.2d 411, 412 (9th Cir.1974). Binnings' contract, however, clearly involved an ongoing relationship with NSCSA and Hartmann and there is no evidence that, in addition to procuring various services needed by the vessels while in port, Binnings also actively and directly supervised the performance of those services.

Further, unlike the contract at issue in *Hinkins*, Binnings' contract did not involve only husbanding services, but also called for performance of documentation, cargo solicitation and accounting services. The *Hinkins* court recognized that services of this type were "shoreside" services not within admiralty jurisdiction and distinguished the case before it from previous case law on the basis that these shoreside services were not involved in *Hinkins*. See *Hinkins*, 351 F.Supp. at 375. In order for a contract to be within the admiralty jurisdiction, either it must be wholly maritime or its nonmaritime elements must be insubstantial or separable. *Outbound Maritime Corp.*, 582 F.Supp. at 1142; *United Fruit Co. v. United States Shipping Bd Merchant Fleet Corp.*, 42 F.2d 222, 224 (D.Mass.1930). It is clear that the services provided by Binnings other than husbanding were not insubstantial. In fact, Mr. Hanlon, Binnings' vice president and general counsel, stated that husbanding was "to a great extent ... a minor part of the services that ... you render to a liner service." Those other services also are inseparable from the husbanding services provided. Binnings' commission was earned for the performance of all these services, without any division or distinction among them. Thus, even if *Hinkins* were otherwise persuasive authority for the proposition that husbanding agreements are maritime contracts, the presence of substantial, inseparable nonmaritime elements in Binnings' agreement still would require that Binnings' agreement be held to be outside admiralty jurisdiction. The district court erred in holding that it had admiralty jurisdiction over this proceeding based on the maritime nature of Binnings' agency agreement.[4]

**B. Jurisdiction Under the FMLA**

■ Binnings argues that the district court had admiralty jurisdiction over this

had "a direct relation to a ship engaged in commerce on navigable waters." *Id.*

**4.** In holding that Binnings' agency agreement was not a maritime contract, we recognize that the rule that such contracts are not within the admiralty jurisdiction has been condemned by commentators, *e.g.,* G. Gilmore & C. Black, *supra,* § 1–10, at 28 n. 94b (predicting that Supreme Court will hold general agency agreements within admiralty jurisdiction when it next considers the issue); 7A J. Moore, *supra,* para. .250, at 3006 ("Quite clearly, such agreements are in integral part of, and in furtherance of, maritime commerce and, consequently, should be cognizable within the admiralty jurisdiction of the district courts."), as well as by courts. *See Peralta,* 739 F.2d at 804 ("A general agency relationship is intimately related with the shipping industry and would warrant inclusion within admiralty.") Nevertheless, the rule has been firmly established since the Supreme Court decision in *Minturn v. Maynard,* 58 U.S. (17 How.) 476, 15 L.Ed. 235 (1854). As other courts have noted before us, *see Peralta,* 739 F.2d at 804, if the rule excluding general agency agreements from the admiralty jurisdiction is to be overruled, the Supreme Court is the appropriate court to do so, and that Court recently once again declined to pick up the gauntlet in response to the Second Circuit's suggestion that such a decision by the Supreme Court would be welcomed. *See Peralta Shipping Corp. v. Smith & Johnson (Shipping) Corp.,* 470 U.S. 1031, 105 S.Ct. 1405, 84 L.Ed.2d 791 (1985) (Blackmun, J., dissenting from denial of certiorari).

action even if the contract out of which Binnings' services arose is not a maritime contract because the FMLA provides a separate basis for jurisdiction.[5] Binnings asserts that the maritime nature of the contract is relevant only to liens arising under the general maritime law and that a maritime lien can arise and be enforced under the FMLA although the underlying contract would not be considered maritime. The district court agreed, stating that "services need not be rendered pursuant to a maritime contract to support a claim for a lien."

This argument misconstrues the nature of maritime liens. Maritime liens arise out of the breach of contracts that are maritime in nature. 7A J. Moore, *supra,* para. C.05, at 623. Therefore, "to give rise to a maritime lien, the occurrence out of which the ... dispute arose must itself be maritime" and "[t]hat means that the occurrence must be within the admiralty jurisdiction of the United States as established by the Constitution and adopted by the Congress." *Id.* para C.03, at 611; *accord, The Walter Adams,* 253 F. 20, 24 (1st Cir.1918), *aff'd sub nom. Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.,* 254 U.S. 1, 41 S.Ct. 1, 65 L.Ed. 97 (1920) ("A contract cannot afford the necessary basis for a maritime lien, unless it is maritime in its nature, so as to be cognizable in admiralty"); G. Gilmore & C. Black, *supra,* § 9–20, at 624 ("To give rise to a lien a claim must be in the first instance maritime" and "[t]hus we recur to the question of what is within the jurisdiction of the admiralty: .... which contracts are maritime contracts," for "[t]here can be no mar-

itime lien which does not involve a vessel, its cargo or freight and arise out of a maritime contract or a maritime tort or some peculiarly maritime operation such as salvage."). Therefore, a prerequisite to the existence of a maritime lien based on breach of a contract for services is that the subject matter of the contract must fall within the admiralty jurisdiction.

■ Congress, of course, may extend the admiralty jurisdiction to areas not formerly included within it "as experience or changing conditions might require," so long as it keeps within "a proper conception of maritime concerns." *Detroit Trust Co. v. The Thomas Barlum,* 293 U.S. 21, 48, 55 S.Ct. 31, 40, 79 L.Ed. 176 (1934). There is no indication, however, that the FMLA was intended to enlarge the admiralty jurisdiction to include agency contracts. In *Piedmont & Georges Creek Coal Co. v. Seaboard Fisheries Co.,* the Supreme Court stated that Congress had three purposes in passing the FMLA: (1) to do away with the artificial distinction by which a maritime lien was given for supplies provided in a foreign port, but not for those furnished in the vessel's home port, (2) to do away with the presumption that when the owner contracts in person for necessaries or is in the port when they are ordered the materialman did not rely on the credit of the vessel, and (3) to substitute a single federal statute for the various state statutes. 254 U.S. 1, 11, 41 S.Ct. 1, 4, 65 L.Ed. 97 (1920). Beyond these alterations in the existing law, the FMLA made "no change in the general principles of the ... law of maritime liens." *Id.*[6]

The broad interpretation given the FMLA with regard to the types of mari-

---

**5.** Section 971 of the FMLA provides that:

Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of the vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

46 U.S.C.A. § 971.

**6.** A further indication that the FMLA did not extend admiralty jurisdiction into traditionally nonmaritime areas is the way in which claims for a lien under the FMLA for services and

supplies provided to a vessel that is under construction rather than being repaired have been treated by the courts. Although provision of services and supplies for construction clearly falls within the language of section 971, the supplier has been held not to have a lien, or even a maritime cause of action, because contracts to construct a new vessel traditionally have been held to be outside the admiralty jurisdiction. *See New Bedford Dry Dock Co. v. Purdy,* 258 U.S. 96, 98–99, 42 S.Ct. 243, 243–44, 66 L.Ed. 482 (1922) (claimant of lien under FMLA for supplies and services furnished must establish that agreement was maritime in that it dealt with repair rather than original construction);

time claims that may give rise to a lien does not dictate a contrary result. Although the present state of the law with regard to coverage of the FMLA is "not far from the point where any service which is convenient, useful and at times necessary may qualify as a lien under the Lien Act," the "ancient distinction between claims maritime and nonmaritime ... survives: to be a lien on any theory a claim must be in the first instance maritime." G. Gilmore & C. Black, *supra,* §§ 9–34 to 35, at 658–59.[7]

## III. CONCLUSION

The subject matter of Binnings' agency agreement deals with preliminary services

and, therefore, that contract is not a maritime contract and is outside the admiralty jurisdiction. The fact that Binnings claims a lien on the Saudi Riyadh for performance of those services under the FMLA does not change the character of those services or create in the district court the admiralty jurisdiction that is otherwise lacking. The district court was without subject matter jurisdiction over this in rem proceeding.[8]

The judgment of the district court is REVERSED and the cause is REMANDED to the district court with instructions that the action be DISMISSED for lack of subject matter jurisdiction.

REVERSED and REMANDED with instructions.

---

*accord, The Dredge A,* 217 F. 617, 628 (E.D.N.C. 1914) (refusing lien for material supplied to dredge while under construction) (purpose of statute was not to create a new class of liens or liens for services that had before been determined not to be maritime, "but only to deal with certain matters that had always been recognized as cognizable in admiralty."); 7A J. Moore, *supra,* para. C.05, at 627–28.

**7.** Binnings points to a number of cases which it claims have allowed maritime liens under the FMLA for services arising out of contracts that a leading authority on admiralty lists as having been held nonmaritime for purposes of the general maritime jurisdiction. *See* 1 Benedict § 187. These cases do not stand for the proposition that the FMLA enlarged the traditional admiralty jurisdiction. Rather, comparison of these cases with those cited in Benedict shows that they merely represent differing interpretations of the extent of that jurisdiction. *Compare, e.g., Gilbert Hubbard & Co. v. Roach,* 2 F. 393, 395 (N.D.Ill.1880), *cited in,* 1 Benedict § 187, at 11–27 (contract for storage of sails not within admiralty jurisdiction) *with The Artemis,* 53 F.2d 672, 679 (S.D.N.Y.1931) (finding that storage contracts are within admiralty jurisdiction and that such services are "other necessaries" under the FMLA).

Binnings also cites several cases in which courts have allowed maritime liens under the FMLA in favor of special agents. We do not find these cases persuasive. Some of these cases are distinguishable from the present case because they involve recovery by a special agent of monies advanced on behalf of its principal. *E.g., Ameejee Valleejee & Sons v. M/V Victoria U,* 661 F.2d 310, 312 (4th Cir.1981); *Todd Shipyards Corp. v. The City of Athens,* 83 F.Supp. 67, 87 (D.Md.1949). Special agents traditionally have been given a maritime lien for advances made on behalf of their principals on a theory akin to subrogation when the services for which

advances were made would give rise to a maritime lien in favor of the person actually supplying the services. *See Compagnia Maritima La Empresa, S.A. v. Pickard,* 320 F.2d 829, 833 (5th Cir.1963); 2 Benedict § 33, at 3–12 to 3–17. Another of these cases apparently involved a claim for fees in providing services under a management agreement as opposed to an agency agreement. *Trinidad Corp. v. Sea-Hire Service S.A.,* 1984 A.M.C. 2371, 2371 (E.D.N.Y.), *aff'd,* 742 F.2d 1441 (2d Cir.1983), *cert. denied,* 467 U.S. 1242, 104 S.Ct. 3514, 82 L.Ed.2d 823 (1984). In at least one of the cases cited, however, the court did allow a maritime lien in favor of a special agent for fees for agency services as well as for advances. *Handelfinanz A.G. v. S.T. Evanthia,* 1955 A.M.C. 340, 344 (D.N.J.1954). None of the cases cited by Binnings, however, considered the threshold jurisdictional question raised by an action seeking a maritime lien for commissions earned in providing agency services traditionally considered not to give rise to a maritime contract. The only authority presented to the Court on this issue is that no lien can arise for such services. *E.g., Morgan Guaranty Trust Co. of New York v. M/V Hellenic Sun,* 1987 A.M.C. 217, 218–19 (D.Md.1986) [Available on WESTLAW, DCTU database] (denying lien for brokerage commission because contract was preliminary to a maritime contract); *The J.C. Williams,* 15 F. 558, 560 (S.D.N.Y.1883) (commissions due agent or ship's husband for procuring charter and making advances do not give rise to maritime lien).

**8.** The parties have raised a number of other issues on appeal, including whether Binnings' services qualify as "other necessaries" and can be said to have been furnished to the Saudi Riyadh under the FMLA. Because we find that the district court did not have subject matter jurisdiction over this action, we do not reach these other issues.